# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

**ALEJANDRO FIGUEREDO,**

    Plaintiff,

vs.                                        CASE NO. 4:04cv323-RH/WCS

**LYNN HILL, Assistant Warden,**
**LAUNDRY ROOM SERGEANT,**
**and LAUNDRY ROOM OFFICER.**

    **Defendants.**

_____/

## SECOND REPORT AND RECOMMENDATION[1]

Plaintiff, proceeding *pro se*, filed a second 232.62amended complaint, doc. 13, and in response, Defendant Hill filed a special report, doc. 32, with numerous attachments. The report was construed as a summary judgment motion as is the practice of this Court in prisoner complaints, and Plaintiff was advised of his obligation to respond to the motion for summary judgment in accordance with Rule 56. Doc. 34. Plaintiff was given until July 8, 2005, in which to respond. *Id.* Nothing has been received from Plaintiff and, thus, Defendant Hill's evidence in support of summary judgment is unrebutted.

---

[1] Previously, Plaintiff's claim against the Secretary of the Department of Corrections was dismissed. Docs. 27, 30.

**Allegations of the second amended complaint, doc. 13**

Plaintiff filed the second amended complaint after having been released from prison. Plaintiff's claims concern conditions of his confinement at Madison Correctional Institution in Madison, Florida. Plaintiff contends that after being transferred to Madison C.I., he "tried repeatedly to obtain thermo underwear, and sweatshirt to protect against the cold weather, pursuant to MCI Institutional Policy which state in part that all prisoners WILL be given Thermo [sic] underwear (top & bottoms) as well as a sweatshirt." Doc. 13, p. 8. Plaintiff was repeatedly denied these items by the laundry officer and laundry sergeant. *Id.* Plaintiff grieved the issue to Defendant Hill, the assistant warden at Madison C.I. who denied Plaintiff's grievance. *Id.* Defendant Hill "declined to order laundry staff to furnish plaintiff with adequate warm clothing" and advised Plaintiff in her response to his grievance that a memorandum issued from Tallahassee (Central Office) informed officials at Madison that they were not required to provide Plaintiff with the warm clothing requested by Plaintiff. *Id.*

Plaintiff claimed that Defendants told him only inmates working on the outside grounds and who were exposed to the elements would receive the thermal clothing. *Id.* Plaintiff asserts, however, that he works in the kitchen and is called out at 3:30 a.m. and must "stand in the freazing [sic] cold weather in line for 30 to 45 minutes before" being led to the kitchen. *Id.* Additionally, Plaintiff contends that all prisoners are forced outside after breakfast ALL day. *Id.* Plaintiff contends that the light weather jacket he is issued is only satisfactory for temperatures in the 60s, not in the 20s, 30s, or 40s and he has experienced "pain and suffering and sickness." *Id.* Plaintiff states that prisoners are prohibited from doubling up their clothing to keep warm. *Id.* Plaintiff contends that

his exposure to the cold weather resulted in him being hospitalized for five days with pneumonia and/or bronchitis.[2]

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment, the Defendant initially has the burden to demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). If accomplished, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial. *Id*. An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004)(citations omitted). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260, *quoting* Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986). All reasonable inferences must be resolved in the light most favorable to the nonmoving party. Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999).

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

---

[2] Plaintiff asserted he was diagnosed in the hospital with pneumonia, but that nursing staff at the institution told him he had "bronchitis to protect themselves against liability . . . ." Doc. 13, p. 9.

file,' designate 'specific facts showing that there is a genuine issue for trial.' " Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting* Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.  In this case, Plaintiff has not produced any evidence at all.  Defendant Hill's evidence must be considered to be uncontroverted.

Local Rule 56.1(A) provides that a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried."  The Rule also provides that the party opposing the motion shall serve a similar statement of material facts as to which the party contends there is a genuine issue to be tried, using the same format.  A movant's properly filed statement of undisputed facts will be deemed to be admitted unless controverted by the opposing party in the manner specified by the Rule. *See* Jones v. Gerwens, 874 F.2d 1534, 1537 n.3 (11th Cir. 1989) (determining that plaintiff's failure to controvert defendants' statement of undisputed facts filed in compliance with a similar local rule of the Southern District of Florida constituted an admission that such facts were not disputed for summary judgment purposes.).  Here, Defendant Hill's version of the facts is deemed admitted by Plaintiff.

**The relevant Rule 56(e) evidence**

Plaintiff entered the custody of the Department of Corrections on July 18, 2001, and was transferred to Madison Correctional Institution on December 13, 2001.  Doc.

32, p. 3. Plaintiff was eventually transferred away from Madison C.I. on April 22, 2002. *Id.* This case concerns events at Madison between December, 2001, through February 26, 2002. *See* doc. 13, p. 8.

On December 20, 2001, after his arrival at Madison, Plaintiff was assigned to work in food service. Doc. 32, p. 3; *see also* exhibit B.[3] Inmates assigned to work in food service work every other day, and on the days they work, they would be "inside in the kitchen or dining hall for a significant portion if not all of the day working breakfast, lunch, and dinner." Ex. 7, p. 6.

Inmates working in food service are escorted together out of the same dormitory[4] and immediately taken inside the cafeteria. *Id.*, at 4; ex. 7, p.6. Defendant Hill has stated in her affidavit that inmates leave the dorm at approximately 3:30 a.m. and are escorted to the cafeteria where there are "let in by staff to begin working." Doc. 32, ex. F, (ex. 6, p. 15).[5] Inmates do "not wait outside for 30 to 45 minutes prior to leaving for the cafeteria." Ex. 6, p. 15; *see also* ex. 7, p. 6. For security reasons, a large group of inmates will not be permitted "to stand around outside in the dark." Ex. 6, pp. 15-16;

---

[3] As Plaintiff did not file any evidence, all references to exhibits are those submitted with the special report, doc. 32. The exhibits have been filed in the following rather confusing manner: (1) attachment 1 contains exhibits A through C-18; (2) attachment 2 consists of exhibit C-19 through C-30; (3) attachment 3 consists of exhibit C-31 though C-39; (4) attachment 4 contains exhibit C-40 through C-58; (5) attachment 5 is exhibit C-58 through exhibit D-7; and (6) attachment 6 continues with exhibit D-9 through exhibits E, F, and G. Attempting to locate an exhibit which counsel identifies in the special report only as composite exhibit C is a time-consuming endeavor as counsel has not provided a pin-point citation within the many pages of exhibits.

[4] Food service inmates are housed together in the same dorm. Doc. 32, p. 4.

[5] For ease of reference, many of these records will be noted with the electronic exhibit number and page reference. Counsel should provide these pin-point references in the future. *See* N.D. Fla. Loc. R. 56.1(A).

*see also* ex. 7, p. 6. After the breakfast shift, those inmates who prepared the breakfast meal are "allowed to go back to the dorm and sleep if they chose to do so" because they must wake up so early. Ex. 6, p. 16. Alternatively, food service inmates could stay in the dining hall. Ex. 7, p. 6.

On the days Plaintiff worked, "he was indoors working in the cafeteria for a substantial part of the day." Ex. 6, p. 14. When Plaintiff worked in food service, he "would have spent very little if any time outside." *Id.*, at 16. On the days "Plaintiff was not working [in] the kitchen, he would be required to go outside after breakfast, unless he was in medical, classification, or inside for some other reason." Ex. 7, p. 7.

Defendant Hill acknowledges that during the week, Monday through Friday, inmates would be "required to be outside of the dorms so that the housemen could clean the dorms, showers, etc." Ex. 6, pp. 15-16. "However, if the weather was very cold, or cold and extremely windy, or raining, security would not require the inmates to go outside, but they could stay inside a heated environment." *Id.*, at 16. Accordingly, there is evidence that on the days Plaintiff did not work, which would be every other day, inmates would be outside after breakfast "unless they were indoors for a class, medical, job assignment, classification appointment, or some other reason." Doc. 32, p. 5. The inmates would return inside for "master count" and then go to lunch. *Id.* After lunch, once again the inmate "who did not have a reason to be inside were outside until they went back to the dorm for count, and then went to the dining hall for dinner." *Id.* During the colder months of the year, October through March, it gets dark earlier and, therefore, for security reasons the inmates do not remain outside after dinner but are taken back to their dorms for the night. Doc. 32, p. 5. On Saturdays and Sundays,

inmates are permitted but not required to go outside. *Id.*, at 5; ex. D. The dormitories remain "open on weekends, and the inmates had the option to go outside, but were not required to do so." Ex. 7, p. 6.

Plaintiff worked in food service for approximately one week, until the morning of December 27, 2001, when he reported to the medical clinic complaining of a cough, stuffy nose, and fever. Doc. 32, pp. 3 and 6; ex. C. Plaintiff had an elevated fever, and was placed in the infirmary for observation, given Tylenol, and directed to increase his fluid intake. *Id.*, at 6; ex. C. An entry in Plaintiff's medical records indicate that while he was being observed in the clinic on December 27th, he was wearing two t-shirts, had on a hospital gown, and was "sleeping with the blankets over his head." Ex. C, (ex. 3, p. 12). Plaintiff stayed in the clinic until the following day, December 28th, when he was then "admitted" to the infirmary "to rule out the possibility of pneumonia." Doc. 32, p. 3, n.4; p. 6; *see* ex. 3, p. 9; ex. 2, p. 7.

Dr. Velasco ordered blood work and a chest x-ray; both results were normal. Ex. 3, pp. 7-8. The chest x-ray indicated Plaintiff's lungs were "clear and there [was] no evidence of pleural effusion." Ex. 3, p. 1. Dr. Velasco prescribed Plaintiff an antibiotic, a decongestant, and a cough syrup, and Plaintiff remained in the infirmary until being released on January 2, 2002. *Id.*, at 2-4. Dr. Velasco diagnosed Plaintiff with "5 days of acute bronchitis." Doc. 32, pp. 5-6; ex. C.

After Plaintiff was released from the infirmary, he was assigned on January 3, 2002, to a Tile Setting vocational course. Doc. 32, p. 4; exhibits B, D. This class lasted all day, Monday through Friday, and was conducted "indoors in a heated environment." *Id.*, at 4; exhibits D, F. Again, Defendant Hill avers that while in this class, "Plaintiff

would have spent most all of his time indoors either in the Tile Setting class, in the cafeteria for meals, of for any other reason such as medical, classification appointments, etc."  Ex. 6, p. 16.  "On the weekends, the dorms remained open during the day, and the inmates were not required to go outside."  *Id.*  While in the tile setting course, Plaintiff "would have been outside only by his own choosing."  Ex. 7, p. 6.

After being in the Tile Setting course for just over a month, Plaintiff was reassigned back to food service on February 14, 2002.  Doc. 32, p. 4; ex. B (ex. 2, p. 4). Plaintiff remained in that position through February 25, 2002, when Plaintiff was placed in administrative confinement through March 5, 2002.  *Id.*, at 4; ex. B.  On that day, he was placed in disciplinary confinement until April 22, 2002, when he was transferred from Madison Correctional Institution to Taylor Correctional Institution.  *Id.*, at 4-5; ex. B. While housed in confinement, Plaintiff was outdoors only rarely, "most likely a few hours per week . . . ."  *Id.*, at 5; ex. D.  Defendant Hill stated that "pursuant to rule Plaintiff would have spent very little time outdoors, usually three hours per week for exercise, and he could choose not to go outside."  Ex. 6, p. 16.

All inmates are provided "shoes, socks, underwear, shorts, long pants, undershirts, shirts, and a jacket for cold weather.  Doc. 32, p. 5; ex. 6, p. 16.  Inmates are also allowed to layer their items of clothing if desired and, while outside, may move around and exercise which might also keep them warm.  Doc. 32, pp. 5-6; ex. 6, p. 16. Inmates (who can afford to do so) are able to purchase items of clothing from the prison canteen such as sweatshirts and thermal underwear.  *Id.*, at 6; ex. F.

During the time that Plaintiff was housed at Madison Correctional Institution, budget cuts within the Department of Corrections necessitated providing sweatshirts

and thermal underwear only to those inmates assigned to work outdoor duties.  Doc. 32, p. 6; ex. D.  "On January 4, 2002, the Department issued a memorandum informing all the institutions in the State to issue thermal underwear and sweatshirts only to those inmates working outside assignments, and during cold winter weather as determined by the Warden, those inmates not working outside assignments would be permitted to remain indoors in a heated environment."  Doc. 32, p. 6; ex. D.

Defendant Hill acknowledges that Plaintiff submitted a grievance requesting a sweatshirt and thermal underwear.  Doc. 32, p. 6; ex. D (ex. 6, pp. 14-17).  Defendant Hill also acknowledges advising Plaintiff when responding to his grievance that "the Department's Central Office sent a memorandum to all the Department's institutions stating that the institutions may only issue thermal underwear and sweatshirts to those inmates working outside assignments, and during cold winter weather as determined by the Warden, inmates not on outside assignments would be permitted to remain in a heated environment."  Ex. 6, p. 15.[6]  Defendant Hill further informed Plaintiff that the items "would be stocked in the canteens for purchase as soon as the vendor could make them available."  *Id.*  Thus, Plaintiff was told that budget constraints precluded Madison Correctional Institution from providing thermal underwear and sweatshirts to every inmate and only inmates working outside would be issued those items.  *Id.*

As additional evidence, Dr. Velasco submitted an affidavit in which he states that he reviewed Plaintiff's medical records and, in his medical opinion, that Plaintiff "did not suffer a medical condition which would have been caused by exposure to cold weather."

---

[6] Defendant Hill stated that the memorandum was issued on January 4, 2002, and was received at Madison Correctional Institution on January 7, 2002.  Ex. 6, p. 15.

Exhibit C (ex. 2, p. 6-7). In the affidavit, Dr. Velasco testifies that he diagnosed Plaintiff with "acute bronchitis" and avers that "acute bronchitis, is not caused by exposure to cold weather." Exhibit C (ex. 2, p. 7). Dr. Velasco stated:

> Acute bronchitis spreads from person to person through cough droplets. The viruses that cause the infection are sprayed into the air or onto people's hands when they cough. You can catch acute bronchitis if you breathe in these viruses or touch hands coated with theses viruses. Exposure to cold weather has little or no effect on the development of severity of conditions such as acute bronchitis, or the common cold. [Plaintiff] did not suffer any health problems such as frostbite, trench foot, or hypothermia which are caused by exposure to cold weather.

Ex. 2, p. 7. Dr. Velasco further stated that to his "knowledge, during the approximately seven years that [he has worked] at Madison Correctional Institution, there has never been an inmate [there] who has suffered a health problem directly caused by exposure to cold weather." *Id.*, at 8.

Dr. Velasco also submitted his opinion that after reviewing the "daily outdoor temperatures and weather conditions for the area near Madison Correctional Institution for the period of December 2001 through February 2002" that these "recorded temperatures and weather conditions were not nearly extreme enough to pose any health risks to Plaintiff." Ex. 2, p. 7.

Defendant Hill also submitted a print-out of the actual temperatures as recorded at nearby Valdosta, Georgia. Doc. 32, ex. 6, pp. 2-13. The coldest days in December were recorded as:[7] December 26th - low of 28, high of 48; December 27th - low of 24, high of 55; December 28th - low of 28, high of 64; December 30th - low of 32, high of 55; and December 31st - low of 32, high of 51. Doc. 32, ex. 6, pp. 3-5. In January,

---

[7] Only those days with temperature below freezing have been cited.

2002, there were also a good number of cold days, recorded as follows: January 1st - low of 28, high of 53; January 3rd - low of 30, high of 39; January 4th - low of 23, high of 48; January 5th - low of 21, high of 55; January 8th - low of 25, high of 48; January 9th - low of 25, high of 64; January 16th - low of 30, high of 63; and January 17th - low of 32, high of 64. Doc. 32, ex. 6, pp. 7-9. In February, 2002, the following cold days were recorded: February 24th - low of 32, high of 66; February 27th - low of 27, high of 46; and February 28th - low of 21, high of 50. Doc. 32, ex. 6, pp. 11-13.

**Analysis**

The United States Constitution does not require "comfortable prisons" with all the amenities, but it requires that prisons not be "inhumane." Farrow v. West, 320 F.3d 1235, 1242 (11th Cir. 2003), *citing* Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994). The conditions of prison life and the treatment of prisoners is governed by the Eighth Amendment, which prohibits cruel and unusual punishment. Farrow, 320 F.3d at 1242-43, *citing* Helling v. McKinney, 509 U.S. 25, 31, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993). In general, "prison conditions rise to the level of an Eighth Amendment violation only when they 'involve the wanton and unnecessary infliction of pain' " Chandler v. Crosby, 379 F.3d 1278, 1289 (11th Cir. 2004), *quoting* Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). In other words, prison conditions may be "restrictive and even harsh," without violating the Constitution; it is simply part and parcel of incarceration. Chandler, 379 F.3d at 1289; *see also* Dixon v. Godinez, 114 F.3d 640 (7th Cir. 1997), *citing* Farmer v. Brennan, 511 U.S. 825, 833-34, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994).

Case No. 4:04cv323-RH/WCS

A two-part analysis governs Eighth Amendment challenges to conditions of confinement.  *Id.*  "First, under the 'objective component,' a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 8, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992), *cited in* Chandler, 379 F.3d at 1289.

> The challenged condition must be "extreme."  *Id.,* at 9, 112 S.Ct. at 1000. While an inmate "need not await a tragic event" before seeking relief, *Helling v. McKinney*, 509 U.S. 25, 33, 113 S.Ct. 2475, 2481, 125 L.Ed.2d 22 (1993), he must at the very least show that a condition of his confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety, *id.,* at 35, 113 S.Ct. at 2481.  Moreover, the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the challenged condition of confinement].  It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.  *Id.,* at 36, 113 S.Ct. at 2482.

Chandler, 379 F.3d at 1289.  The second part of the analysis requires prisoners to show that prison officials "acted with a sufficiently culpable state of mind" regarding the condition at issue.  Hudson, 503 U.S. at 8, 112 S.Ct. at 999 (marks and citation omitted); 379 F.3d at 1289.  "The proper standard is that of deliberate indifference." Chandler, 379 F.3d at 1289, *citing* Wilson v. Seiter, 501 U.S. 294, 303, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991).

In considering these claims, judges lack "carte blanche to impose [our own] theories of penology on the nation's prisons."  Bass v. Perrin, 170 F.3d 1312, 1316 (11th Cir. 1999); *see* Rhodes, 452 U.S. at 346, 101 S.Ct. at 2399 ("Eighth Amendment judgments should neither be nor appear to be merely the subjective views of judges."

(marks and citation omitted)); *quoted in* Chandler, 379 F.3d at 1290. The analysis "should be informed by objective factors to the maximum possible extent." *Id.*; 379 F.3d at 1290.

In Eighth Amendment cases concerned with an inmate's exposure to cold weather, the Court must consider "both the 'severity' and the 'duration' of the prisoner's exposure to inadequate cooling and ventilation." Dixon, 114 F.3d at 643, *cited in* Chandler, 379 F.3d at 1295. Should a condition exist for just a short period of time, it may be constitutionally acceptable even though the same condition might violate the Constitution when it is permitted to continue for long durations or repeatedly. "The more basic the need, the shorter the time it can be withheld." Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982), *quoted in* Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000).

> For example, the Eighth Circuit found that the Eighth Amendment had been violated where prison officials required inmates to remain outdoors in subfreezing temperatures for less than two hours, even though the inmates were provided with hip-length, lined denim coats and allowed to move freely. *See Gordon v. Faber*, 973 F.2d 686, 687 (8th Cir. 1992). Similarly, we have suggested that depriving an inmate of a jacket could violate the Eighth Amendment under some weather conditions. *See Walker v. Sumner*, 14 F.3d 1415, 1421 (9th Cir. 1994). More modest deprivations can also form the objective basis of a violation, but only if such deprivations are lengthy or ongoing. *See Keenan*, 83 F.3d at 1090-91.

Johnson v. Lewis, 217 F.3d at 732.

Here, the unrebutted evidence demonstrates that between December, 2001, and February 26, 2002, there were approximately sixteen days of very cold temperatures

where the recorded temperatures were below freezing.[8]  On the days Plaintiff worked in food service he would have been exposed to those coldest temperatures when reporting to work at 3:30 a.m.  However, the evidence shows that Plaintiff's exposure to those cold temperatures was brief as Plaintiff was escorted immediately from his dormitory to the cafeteria.  Moreover, the evidence reveals there were only three such days:  December 26th and 27th, and February 24th.  Even viewing the evidence in the light most favorable to Plaintiff, while assigned to food service Plaintiff would have worked every other day.  Thus, he would have worked either December 26th or December 27th and, at most, would actually have been exposed to these conditions once twice.[9]

   Plaintiff was not forced to stand outside for extended periods of time, not even so much as a half an hour.  Plaintiff was undoubtedly cold for brief periods of time, but these conditions were not so severe as to constitute cruel and unusual punishment.  Plaintiff was outside only long enough to move from place to place.  There is no evidence that Defendant Hill required Plaintiff to remain outside in cold temperatures for extended periods of time.

   Even on the days Plaintiff was not working, he was not required to spend lengthy periods of time outside.  The evidence shows that on days with cold temperatures or otherwise harsh conditions, inmates were not required to be outside, but could remain

---

[8] While the temperature did not fall below the freezing mark, there were also numerous other days which registered temperatures quite cold for the Florida climate.

[9] It is also possible that Plaintiff worked only one day in this extreme cold due to the every-other-day working schedule.  With two of the very cold days in December coming back to back, then Plaintiff would have worked just one of those days.

Case No. 4:04cv323-RH/WCS

inside in a heated environment. Plaintiff has not provided any evidence showing that the clothing he received from the Department of Corrections was unconstitutionally insufficient for the brief periods of time he was outside.

There were seven additional days in January which were quite cold, but during this time Plaintiff was in the tile setting course. His exposure to the cold weather while in the course would have been fairly brief also, merely moving from place to place, just as he did when working in food service. That is a total of ten days.

Of the remaining six days of below freezing temperatures, Plaintiff was in the infirmary on four of those days (December 28th, 30th, 31st, and January 1st) and would have been in a heated environment. Plaintiff was also in confinement for the remaining two days, February 27th and 28th, and would not have been outside. If Plaintiff did go outside during that time, it was Plaintiff's choice to do so and if he was cold, he could have chosen to return inside to a heated cell.

Thus, Plaintiff would have been exposed to freezing temperatures only on ten days, and in general, his exposure was brief due to his participation in the tile setting course and his work assignment, both of which were indoor activities. Despite Plaintiff's claim that he was not allowed to layer his clothing, when he reported to the infirmary, he was wearing two T-shirts; thus, he could layer clothing to stay warm. Plaintiff was issued a shirt, he could wear more than one T-shirt or undershirt, and he was issued a jacket. Though the jacket was apparently only a light weight jacket, along with the other items of clothing, it cannot be said that the exposure was so extreme as to violate the

Constitution, especially in light of the limited period of time Plaintiff was outdoors.[10] Plaintiff was outside only briefly, walking to or from the dormitory to the kitchen or his classroom.  Any greater time outside would have been at Plaintiff's own choosing.

The failure to provide Plaintiff with a sweatshirt or thermal underwear is insufficient when Plaintiff was not forced to stay outdoors in cold weather, he was able to layer clothing, and was issued a jacket.  Though budget cuts created a situation where decisions had to be made to allocate limited resources, Plaintiff has not provided any evidence to show that he was harmed by the decision that was made.  There is simply no evidence to show that Plaintiff was subjected to an unconstitutionally infirm condition of confinement due to the cold weather.  Defendant Hill is entitled to summary judgment.

Finally, it is noted that Plaintiff listed two unnamed persons as Defendants in this case.  These persons have not been identified, nor has service been directed on them.  However, in light of the resolution of the claims against Defendant Hill, any potential claims against these persons are insufficient as well. Additionally, because it appears that these unnamed officers would have been following the direction of Defendant Hill, there is no need to take any further action on these claims.

---

[10] Although Defendant argues that Plaintiff could purchase a sweatshirt from the canteen, the evidence is insufficient to affirmatively show that the item was actually available from the canteen.  Indeed, the item was to have been made available as soon as the vendor could stock it, but there is no evidence as to when that took place.  Moreover, there is no evidence suggesting that Plaintiff could afford to buy a sweatshirt or thermal underwear while he was incarcerated.

Case No. 4:04cv323-RH/WCS

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant Hill's motion for summary judgment, docs. 32 and 33,[11] be **GRANTED** and that judgment on all claims be entered in favor of all Defendants.

**IN CHAMBERS** at Tallahassee, Florida, on January 4, 2006.

    s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

---

[11] Document 32 is the special report. The order, doc. 34, construing the report as a summary judgment motion results in listing it again on the electronic docket as document 33.